```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   KAWADA CO., LTD.,                ) Docket No. 19 C 6838
                                      )
 4                   Plaintiff,       )
                                      )
 5              vs.                   )
                                      )
 6   THE INDIVIDUALS, CORPORATIONS,   )
     LIMITED LIABILITY COMPANIES,     )
 7   PARTNERSHIPS AND UNINCORPORATED  )
     ASSOCIATIONS IDENTIFIED ON       )
 8   SCHEDULE A HERETO,               ) Chicago, Illinois
                                      ) December 18, 2019
 9                   Defendants.      ) 9:57 o'clock a.m.

10              TRANSCRIPT OF PROCEEDINGS - MOTIONS
                BEFORE THE HONORABLE JOHN Z. LEE
11
     APPEARANCES:
12
     For the Plaintiff:        HUGHES, SOCOL, PIERS, RESNICK
13                               & DYM, LTD.
                               BY:  MR. WILLIAM B. KALBAC
14                             Three First National Plaza
                               70 West Madison Street, Suite 4000
15                             Chicago, Illinois  60602

16   For Intervenor           SKADDEN, ARPS, SLATE, MEAGHER
     ContextLogic, Inc.          & FLOM
17   d/b/a Wish:              BY:  MR. PATRICK J. FITZGERALD
                                   MR. WILLIAM E. RIDGWAY
18                             155 North Wacker Dr, Suite 2700
                               Chicago, Illinois  60606
19
     Court Reporter:           MR. JOSEPH RICKHOFF
20                             Official Court Reporter
                               219 S. Dearborn St., Suite 2128
21                             Chicago, Illinois  60604
                               (312) 435-5562
22
                   * * * * * * * * * * * * * * * * *
23
                     PROCEEDINGS RECORDED BY
24                   MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED BY COMPUTER
25
```

1         THE CLERK:  Recall of Case 19 CV 6838, Kawada vs. The

2  Partnerships.

3         MR. KALBAC:  Good morning, your Honor, Bill Kalbac on

4  of behalf of plaintiff.

5         MR. RIDGWAY:  Good morning, your Honor, Bill Ridgway

6  and Pat Fitzgerald on behalf of intervenor Wish.

7         THE COURT:  Good morning.

8         So, first of all, I understand that Kawada does not

9  object to ContextLogic or Wish's motion to intervene.

10         Is that correct?

11         MR. KALBAC:  That is correct, your Honor.

12         THE COURT:  So, I'll go ahead and grant that motion

13  as being unopposed.

14         Now, as I understand it, the plaintiff has proposed

15  certain revisions to the aspects of the proposed injunctive

16  order that would impact Wish on a going-forward basis.  As I

17  understand it -- and I just want to make clear -- Wish has

18  already -- Wish at this point has taken down the infringing

19  products, right -- or the alleged infringing products?

20         MR. RIDGWAY:  It has, your Honor.

21         THE COURT:  And with regard to the funds related or

22  of the defendants in this case, at this point at least, are

23  you holding them?

24         MR. RIDGWAY:  They have been held, yes.

25         THE COURT:  Okay.

1          And, so, what I want to hear from Wish, then, is what

2     are you trying to accomplish here, and what are your concerns

3     with regard to the proposed injunctive relief order?

4          MR. RIDGWAY:  Yes, your Honor.

5          So, Wish complies with the orders as they come in,

6     even if it believes they are not justified.  So, that's the

7     reason why Wish, in this circumstance and in many others, will

8     comply with the orders as they're issued.  That doesn't take

9     away from the fact that we don't believe, on the record and on

10    the presentation that they've provided, that a non-party could

11    be bound by this injunction whatsoever and, certainly, now

12    that -- it has been narrowed some, but certainly still, on a

13    full asset freeze for these merchant accounts, even though

14    only a very, very small portion of the allegedly infringing

15    products are associated with plaintiff's marks and sales

16    associated with plaintiff's marks.

17         And, so, what they're coming in and obtaining is --

18    you know, these are small business owners.  They have multiple

19    different products.  And plaintiff, when they went through and

20    took screenshots and presented those to the Court, they took

21    screenshots of an individual product, but not of all the other

22    products that are made available by those merchants.  And,

23    frankly, there's a reason for that, though; and, that's

24    because the vast majority of these products are completely

25    unrelated and are not even allegedly infringing the

1  plaintiff's products.

2       And, so, they're seeking to freeze all of those funds

3  based only on a mere product listing.  And in some cases,

4  there's no sales whatsoever associated with that product

5  listing.  And, so, we think that that's vastly overbroad and

6  not justified by the law.

7       THE COURT:  But my question, I guess, is:  Why does

8  Wish have any skin in that game?

9       So, in other words, say that the defendants --

10  Defendant A defaults and there's a default judgment, and

11  Defendant A has indicated no desire to contest these

12  proceedings or to raise any issues with regard to its funds.

13  So, then I'm in a position where I have to order a default

14  judgment based upon those funds.  At that point, would Wish

15  have standing to come in and say, Judge, that default judgment

16  is not valid because only a portion of those funds actually

17  infringe?  I would say, no, Wish has no standing on that

18  basis.

19       So, at this point, what standing does Wish have to

20  raise the objections with regard to the scope of the -- or the

21  amount of funds that would be frozen for any given defendant?

22       MR. RIDGWAY:  Well, I guess with respect to the

23  standing itself -- so, obviously, the order is compelling Wish

24  to take its customers' funds -- merchant accounts -- and

25  freeze them --

1    THE COURT:  But let's talk about your particular

2    objection.  And I'm not talking about the privity objections.

3    I'm talking about specifically assuming that I find that Rule

4    65 would cover Wish with regard to this injunction.

5    One of the primary objections Wish raised was that

6    the injunction is too broad because it covers lots of

7    uninfringing products.  But what gives Wish standing to make

8    that objection on behalf of what, presumably, are its

9    customers?

10    MR. RIDGWAY:  Well, Wish provides a platform for

11    people to buy and sell things.  And if accounts are being

12    frozen on large numbers -- these TROs are getting larger and

13    larger, and customer accounts are getting frozen down for lots

14    of products that are perfectly lawful -- then that does have a

15    detrimental impact on its platform if these orders are being

16    issued.  And the overbreadth impacts the platform itself and

17    the sales.

18    THE COURT:  But why don't your customers then come

19    into this court and -- why don't these defendants come into

20    court and argue that the scope of the injunctive relief is

21    overbroad?

22    MR. RIDGWAY:  And the customers are free to -- they

23    also have a separate interest apart from those that are --

24    that Wish has in this case.  Wish, though -- I think Wish

25    interests are genuine and apart from the customers themselves.

6

1    Wish provides a platform for people to buy and sell things,

2    and these overbroad injunctions do impact it.

3           So, I don't think it takes apart -- it takes away

4    from the fact that this has a significant impact on Wish's

5    business operations, the fact that a customer also would have

6    the right to come in and say that these are overbroad.

7           We've presented a declaration to show -- and I don't

8    think there's any real rebuttal of that -- that this is --

9    these injunctions are getting issued and asset freezes are

10   applying to individuals and merchants who have one product

11   listing for which there's no sales, and then all the other

12   sales activity is completely unrelated to this case.  And, so,

13   freezing the funds and proceeds for these merchants on that

14   basis, we think, is not justified by the law.

15          THE COURT:  Let me ask you this:  So, say that the --

16   let's say that the injunction was limited in scope,

17   hypothetically speaking, to a customer.  And, so, the

18   plaintiff wishes or requests an injunction against the

19   customer, prohibiting the customer from posting any of its

20   products on Wish.  And assume that the defendant, like these

21   defendants here, have made no indication that they're going to

22   contest that case or those claims.

23          Then, under the law, I have to assume those facts to

24   be true as alleged by the plaintiff.  I issue an injunction --

25   permanent injunction -- prohibiting the customers from listing

1    their -- all of their -- products on Wish.

2         Does Wish then have standing to come in and say,

3    Judge, Judge, you know what, you're prohibiting them from

4    doing legitimate business with us; and, so, we want to contest

5    the default judgment injunction that you issued against the

6    defendants, even though we aren't bound by them at all?

7         MR. RIDGWAY:  Right.  I don't know that we would be

8    in a position to challenge a judgment that restricted what the

9    defendants in this case can do.  I think I agree with your

10   Honor on that point.  The point is where the order is

11   compelling Wish to do something.

12        If, for example, in that scenario your order also

13   ordered Wish not to do business with these and Wish had an

14   independent obligation as a non-party to that order, then I do

15   think Wish would have grounds to both intervene and challenge

16   that finding.

17        So, we're not challenging the Court's ability to

18   issue orders with respect to the defendants themselves.  It's

19   where it affects Wish, where these orders are naming Wish,

20   that's where we believe that there are interests that are

21   not -- or we have the ability to challenge those; and, then,

22   when challenged, we don't believe that they have the law

23   behind them to justify these orders.

24        THE COURT:  I understand that Wish provides a

25   marketplace platform for sellers.  What services does Wish

```
 1   provide?  How does Wish work to a potential seller?
 2           MR. RIDGWAY:  It's -- you know, provide a platform
 3   for buyers and sellers to --
 4           THE COURT:  So, what sort of services does it
 5   provide?
 6           MR. RIDGWAY:  Well, it provides -- I guess -- I'm
 7   sorry --
 8           THE COURT:  I'm sorry.
 9           So, if I'm a seller and I want to sell on Wish, okay,
10   does Wish provide me with a Web site to upload my wares?  Like
11   what does Wish do?
12           MR. RIDGWAY:  Right.  It's not an individualized Web
13   site, but there's a merchant account can be created where a
14   person could sell their goods.  And it provides a mechanism
15   for people to make payments on those goods, that gets routed
16   through Wish.  So, it is a forum for people to buy and sell.
17           THE COURT:  And does Wish retain those payments
18   before -- for some time before it gets transferred to the
19   seller, or is it basically a -- or does it not?  Do the
20   payments just go right to the seller?
21           MR. RIDGWAY:  The payments go to the merchant, and
22   then the merchant -- it's up to the merchant's discretion as
23   to how much money they may retain in their accounts.
24           But those payments are -- from a buyer is going to --
25   sorry.  When I say "to the merchant," I say to a merchant
```

1    account held with Wish.  And, then, a merchant can draw funds

2    from that merchant account at any time in order to pay

3    employees, to pay for product, anything that a -- you know,

4    the type of things a small business owner needs to pay for.

5    So, that's how it functions.

6              THE COURT:  I see.

7              So, Wish, I guess, provides, then, in some respects

8    two primary types of functions.  One is it provides the

9    selling platform, you know, whether it's like Amazon

10   third-party sellers or eBay or what have you.  If you want to

11   sell, you go on and register, you put your wares on.

12             And, then, it provides kind of a payment processing

13   service akin to, say, a PayPal or something like that, where

14   it collects payment for the accounts created by an individual

15   defendant, and it's up to the defendant to figure out what it

16   wants to do with those monies?

17             MR. RIDGWAY:  Correct.

18             THE COURT:  And how does Wish make money?

19             MR. RIDGWAY:  So, it does collect a portion on the

20   sales of products.  That's the main that I'm aware of.  The

21   further detail, I'm happy to provide more information on that.

22   So --

23             THE COURT:  What about on the payment process side?

24   Does it retain a certain -- or does it charge the seller or

25   the purchaser -- does it take a particular percentage for the

1   payment processing function?

2           MR. RIDGWAY:  Your Honor, I'm not familiar with

3   whether that's separate -- there's a separate fee associated

4   with the payment processing tool as opposed to just one based

5   on the combined services.

6           THE COURT:  I see.  Okay.

7           So, as I understand it, the revised -- the revisions

8   that plaintiff is suggesting or proposing with regard to Wish

9   is that you want Wish to hold on -- freeze the current funds

10  that it has --

11          MR. KALBAC:  Correct.

12          THE COURT:  -- with regard to these defendants?

13          Wish is free to do business with them on a going-

14  forward basis?

15          MR. KALBAC:  That is correct, your Honor, yes.

16          THE COURT:  All right.

17          And what about funds on a going-forward basis that go

18  into that account?  Those would not be subject to the freeze;

19  is that correct?

20          MR. KALBAC:  Yes, your Honor.

21          THE COURT:  Okay.

22          And, then, with regard to whatever obligation Wish

23  may have had to kind of police these Web sites or take those

24  down, are you still insisting that they do that -- well,

25  they've already done that, but that that aspect of the order

1  remain in place at least for activity that took place up to

2  the time of the order?

3        MR. KALBAC:  Yes, that's correct.  We're just

4  basically asking for them to keep the status quo.

5        MR. RIDGWAY:  Your Honor, if I may, one thing that

6  could be -- if your Honor is trying to think about a

7  compromise position, one thing that Wish could readily

8  administer if need be -- and, again, I'm not trying to waive

9  the position that we don't believe -- putting that aside,

10  there could be an order that's issued such that there is a

11  freeze for any sales associated with the products that have

12  been identified by the plaintiff in the amount of whatever --

13  up to the amount in the account, such that then the freeze is

14  tied to the actual -- you know, the claim that they could ever

15  have associated with the lost profits for that individual

16  sale.

17        And, so, there, you wouldn't be -- and in some ways,

18  it would actually be probably, we'd say, overall much more

19  effective in the sense that if someone actually did have, for

20  whatever reason, a large number of infringing sales, their

21  account would be much -- you know, that would have a much more

22  dramatic effect.

23        If you're talking about a merchant who had a foot

24  fault, who accidentally bought a product and didn't recognize

25  that this was associated with plaintiff's mark, and has a vast

1   array of other products and funds associated with those, that

2   will not have a significant impact on their operations.  And

3   in many ways, that's the -- I think, in some ways, the purpose

4   of what we're trying to achieve here, which is to be

5   proportionate to the activity of the -- or the alleged

6   activity of the -- defendants in this case.

7        So, we do think there's a way to -- if your Honor's

8   looking for a compromise -- to administer something along

9   those lines.

10       THE COURT:  And how would that be administered?  How

11  would you go about making that determination?  How would the

12  parties go about making that determination?

13       MR. RIDGWAY:  So, we have records, and we provide

14  them in the discovery in these cases routinely.  They have a

15  product listing ID.  It's very easy for Wish to know the

16  number of sales associated with that product listing.  That's

17  something that's kept track of and automated and can easily be

18  administered on a very quick basis.

19       And, so, they would have confirmation of the numbers

20  associated that are tied to those sales, and they would know

21  then how much was frozen associated with those sales.  And

22  Wish then would be able to administer that sale on a more

23  limited restriction in that circumstance.

24       MR. KALBAC:  Your Honor, the issue we have with that

25  is while the product may in this case be listed for sale as

1    Nanoblock, when -- there's cases where when it's then

2    recorded, it's not recorded as Nanoblock.  It may be recorded

3    as some type of other toy for accounting purposes.  So, it's

4    decreased the amount of sales on paper that they're having of

5    that.

6          So, I don't feel this would be an equitable solution

7    at all because I don't feel that the correct amount would be

8    restrained.  I think the way --

9          THE COURT:  You mean that there are examples where

10    the description that the seller provides -- registers it with

11    Wish -- doesn't reflect that it's a Nanoblock product?

12          MR. KALBAC:  Yes, that would be correct.  So, the

13    accounting would not be accurate.

14          I feel that the way things are right now -- where the

15    account is frozen, we can negotiate with the sellers for

16    proper release of their accounts or settlement -- is much more

17    equitable.

18          MR. RIDGWAY:  Your Honor, if I may, I believe in this

19    circumstance, the order would be placed on Wish initially,

20    which would administer this.  So, if there's some sort of

21    change that could happen after that point, it would be locked

22    down.

23          Now, what I -- I guess I'm wondering what he's trying

24    to suggest is, are there other potential product listings that

25    should be frozen?  I think that's what they're trying to

1    suggest.  And that's where we have concerns about the -- there

2    not being clarity in the order.

3         We believe they should say, here are the product

4    listings we believe allegedly infringe.  Wish is not going to

5    come in and contest that.  Again, that's not our issue.  But

6    we will freeze all sales associated with those product

7    listings.

8         And to the extent that there were some previous

9    activity that they haven't alleged in the case and haven't

10   named, listings that are not identified in this case, we don't

11   believe there's a basis to freeze that and I don't think

12   there's a way to administer that.

13        THE COURT:  I don't think that that's exactly what

14   they're saying.  I think the concern is that when a seller

15   lists a Nanoblock product, on the picture it would say

16   Nanoblock.

17        It would say Nanoblock on the description,

18   presumably?

19        MR. KALBAC:  Yes.

20        THE COURT:  And, so, could you comb through the

21   descriptions to identify products that have Nanoblock in the

22   description?

23        MR. RIDGWAY:  I think we -- that's something that

24   could be done.  The problem is that there's sometimes -- I

25   guess I'm confused because typically how this works is they

1   identify -- the product listings are like -- are URLs.

2   They're specified to the product.  That's the easiest way to

3   administer it because then it's very specific.  They go

4   through and identify the products that are -- allegedly

5   infringe.  They provide those URLs to us and we -- they could

6   -- and those are removed and could be -- and assets associated

7   with those could be frozen.

8           We don't believe -- and I think that's -- I guess I'm

9   confused because we had walked way from that requirement of

10  the TRO where Wish is under the obligation to then search

11  through and search through other items and make decisions

12  about their trademark, which we think would be problematic and

13  difficult to administer.  We believe plaintiff has the

14  obligation to identify the specific product listings, and then

15  we will administer them accordingly.

16          THE COURT:  So, what do we do about cases or

17  defendants that -- and I don't know whether such defendants

18  exist -- where, you know, 80 percent of what they sell on Wish

19  is not Nanoblock items but other items, whether valid or not?

20  How do we deal with that sort of situation?

21          MR. KALBAC:  In that situation, the defendants can

22  present us that evidence themselves and we can negotiate a

23  settlement from there.

24          THE COURT:  Well, but the -- with regard to obtaining

25  a preliminary injunction, though, it's incumbent upon -- the

```
1    burden is on the plaintiff to try to propose a scope of

2    injunctive relief that is appropriate to the case, right?

3              MR. KALBAC:  Yes.

4              THE COURT:  And, so, if a defendant -- hypothetically

5    speaking, let's say a defendant sells a hundred products at a

6    particular time and two are Nanoblocks.  What you would like

7    the Court to do is still enjoin a hundred percent of their

8    account, despite the fact -- well, that's what you would ask

9    the Court to do.  And, then, your feeling is that defendants

10   can come and negotiate with you to decrease that amount to the

11   two percent that is appropriate?

12             MR. KALBAC:  Yes.

13             And we're also proposing that the freeze on the

14   account just happen -- whatever amounts are in the account at

15   the time that the temporary restraining order is entered,

16   those amounts would be frozen.  Anything above that that

17   defendants would earn could still stay in their account to

18   use.

19             So, it wouldn't -- so, there -- I feel it's a fair

20   compromise because defendants then could present us with their

21   sales figures, negotiate lower settlement amounts; but, their

22   account would still be open for them to use and their business

23   would not be crippled.

24             THE COURT:  All right.

25             So, the underlying problem, of course, with all of
```

1    this is that these defendants don't appear, right?

2            MR. RIDGWAY:  Infrequently.

3            THE COURT:  And, so, in some ways, Wish is here -- in

4    some ways -- as a surrogate, to try to argue for these

5    defendants.

6            MR. KALBAC:  Your Honor, if I may, defendants, while

7    they may not appear in court, I have correspondence.  I have

8    probably about a hundred e-mails from various defendants and

9    defendants' attorneys every day who represent these sellers.

10   So, they do not appear in court, but they are present.  And we

11   do negotiate settlements frequently with them.

12           MR. RIDGWAY:  Your Honor, just -- your Honor's hypo,

13   though, is actually the facts of this case in many of these.

14   97 percent of the sales associated with these defendants is

15   unrelated to anything related to plaintiff's marks.  And 40

16   percent of these defendants have zero sales of the products

17   that have been identified.

18           So, when you put an asset freeze on all of their --

19   all of the assets associated with that account, these are --

20   some of these are very large sellers.  And, so, you're

21   depriving the marketplace of all -- while they maybe still

22   operate, the reality is when you freeze the funds of a small

23   business, that grinds their operations to a halt.  And, so --

24           THE COURT:  But, again, isn't the solution that the

25   defendants contact plaintiff's counsel or come into court and

1   contest the preliminary injunction that the plaintiff is

2   seeking?

3         MR. RIDGWAY:  That's one mechanism.  But functionally

4   what's happening, your Honor, is when you get an asset freeze

5   that's completely disproportionate to what is actually at

6   issue, then they're able to negotiate within that setting.

7   So, the reality is what's happening is that they're

8   negotiating with -- where their business is coming to a

9   standstill in a situation in which, you know, we're at a time

10  where everyone's looking to get back to their operation.

11        So, I don't think we should -- at least we don't

12  believe we should get an overbroad order and then let people

13  just negotiate off of that -- off of an overbroad order -- in

14  the midst of an asset freeze.  We think that the appropriate

15  mechanism is to focus on what the rules justify for when an

16  order is appropriate in scope.  And that does, again, have a

17  genuine material impact on Wish, as well.

18        MR. KALBAC:  And this is not grinding their business

19  down to a halt, your Honor.  They would still be able to

20  proceed as normal.  It would simply freeze the amounts at the

21  time of the entry of the temporary restraining order.

22        Oftentimes these defendants regularly sweep funds out

23  of their account into different accounts.  That's why we can

24  only restrain the PayPal accounts.  For example, any payments

25  made through credit card, we have no ability to freeze those

1    accounts.  So, this is just a small slice of their business.

2    I would -- a small tip of the iceberg.  In fact, most payments

3    are probably made through credit card.

4           THE COURT:  Okay.

5           Anything to add?

6           MR. RIDGWAY:  Your Honor, I guess the one final point

7    is we are asking -- you know, in this situation, the plaintiff

8    is asking the Court to draw on the Court's equitable powers.

9    And we do think that using, you know, the two percent or the

10    one percent of allegedly infringing conduct to freeze over 98,

11    90 percent of a merchant's account is not an appropriate

12    use -- doesn't draw upon the Court's equitable powers in a way

13    that's appropriate.  This is extraordinary relief, and it

14    should be narrowly tailored.  So, we do think that also should

15    be a factor here.

16           THE COURT:  Okay.  Thank you.

17           So, ContextLogic, Inc., doing business as Wish.com,

18    has moved to intervene in Kawada Company, Limited's trademark

19    infringement suit against individuals and entities identified

20    in Schedule A of CM/ECF No. 41.  Kawada has responded that it

21    doesn't object to the motion to intervene.  And, so, as I

22    noted, the motion to intervene as unopposed is granted.

23           So, the intervenor, ContextLogic, which I will refer

24    to as Wish, objects to certain aspects of Kawada's proposed

25    preliminary injunction order.

First, ContextLogic contends that because Wish has a procedure by which plaintiff could have requested that Wish take down the infringing product listings, the TRO was improvidently issued and a preliminary injunction should not issue as requested by the plaintiff.  Utilizing such procedures is not a prerequisite, given that nowadays infringers have become increasingly sophisticated and brazen. For example, at the first hint of a potential lawsuit, infringers withdraw an account's infringing product listings, move funds associated with the withdrawn account to offshore banks outside the jurisdiction of the United States, and relist the infringing products under new accounts with funds generated by sales of counterfeit goods.  This practice irreparably harms trademark owners and leaves them with no effective recourse.  These types of cases, in particular, involving offshore sellers require trademark owners to tip off infringers -- requiring trademark owners to tip off infringers would frustrate the purposes of federal trademark infringement and counterfeit laws.

Second, Wish argues that it should not be bound by a preliminary injunction because it has not actively aided and abetted the defendant sellers listed in Schedule A to violate an existing injunction and is also not in privity with these defendants.

Rule 65(d)(2), however, provides that an injunction

may bind not only the parties to the case, but their officers,
agents, servants, employees, and attorneys.

Here, Wish has a contractual relationship with
defendants to provide a functioning marketplace where
defendants' counterfeit wares can be sold to residents of this
district.  Wish also has agreed to process payments for these
defendants and maintain certain funds for their benefit.
Accordingly, the Court finds that it is an agent of the
defendants for the purposes of Rule 65.  See example United
States vs. Mercy Regional Health Systems, Limited, 2008
Westlaw 695918, Southern District of Illinois, March 13, 2008,
stating, "It is clearly within the Court's power to restrain
defendants' brokers, employees and agents.  Of course, it
would be improvident for a financial institution to permit or
restrain defendant from accessing accounts it holds in his or
her name."

As it currently stands, Wish states it has already
removed the infringing listings at issue and has provided
plaintiff with the requested information regarding the Wish
defendant sellers and the accounts associated with the
infringing listings.  Wish objects to the remaining
requirement that it freeze the funds held for the benefit of
defendants on two grounds.

First, Wish posits that only a portion of the funds
that have been frozen are associated with the sales of

1   infringing items.  However, this is an issue in dispute

2   between the alleged infringing sellers, who are the defendants

3   in this case, and the plaintiff.  The defendants have been

4   served and may come to court and make their case.  It is

5   difficult for the Court to see how Wish would have standing to

6   dispute plaintiff's claims or how Wish would be injured in the

7   event that defendants chose not to defend against plaintiff's

8   allegations and rather elect to default on plaintiff's claims

9   here.  The Court finds that Wish lacks standing to interject

10  itself into the merits of plaintiff's Lanham Act claims

11  against the defendants.

12        Second, Wish suggests it may be injured because the

13  injunctive relief plaintiff seeks would prohibit it from

14  conducting legitimate business with the defendants.  But the

15  Court finds that this concern is adequately addressed in

16  plaintiff's proposed amendment to the proposed preliminary

17  injunction.

18        The proposed revised preliminary injunction orders

19  that any third-party providers, including PayPal, Alipay,

20  Wish, DhGate, and Amazon Pay, shall, within five business days

21  of receipt of the order for any defendant or any of the

22  defendants' online merchandise accounts or Web sites, restrain

23  and enjoin any such accounts or funds that are not U.S. based

24  from transferring or disposing of any money or other of

25  defendants' assets associated with sales from product listings

1    identified on Schedule A until further ordered by this Court.

2            Kawada thus represents that funds above and beyond

3    the particular amounts already frozen that are associated from

4    the product listings identified in Schedule A are not

5    restrained under the revised preliminary injunction order, and

6    that Wish would be allowed to continue its relationship with

7    the defendant sellers so long as sellers themselves are not

8    violating the injunction.

9            Accordingly, for these reasons, Wish's opposition to

10   the preliminary injunction that's proposed as amended by the

11   plaintiff is denied by the Court.

12           In the end, this case provides -- is one of a

13   category of cases where typically the defendants who are

14   alleged to infringe on the trademarks of the manufacturer who

15   are from abroad and operate via different sorts of Web sites

16   and payment accounts do not come to court to contest the

17   preliminary injunctions.  Often cases, those defendants also

18   elect, for one reason or another, to default on these cases

19   rather than contesting the motions that are brought by the

20   plaintiff or the claims that are brought by the plaintiff.

21           The plaintiffs are then put in a rather difficult

22   situation because, on the one hand, the trademark law requires

23   them to enforce their trademarks vigorously so that it, as a

24   matter of law, is not found to abandon its trademarks.  And

25   yet when faced with sellers who operate from abroad who in

1   many instances just close down one Web site, open another

2   account under different names and provide unreliable --

3   oftentimes unreliable -- contact information, it puts

4   plaintiff in a very difficult position in this case.

5           The solution is not for marketplace providers or

6   payment processors like Wish or PayPal to come into court to

7   defend the interests of the defendants.  The solution is that

8   if the defendants disagree with either the scope of the

9   injunction or the merits of the claims, defendants themselves

10  come in and defend against those actions here in court.  They

11  leave themselves open to the jurisdiction of this Court by

12  selling their wares into this district.  The Court has

13  jurisdiction over them.  They should come and defend their

14  interests.

15          I understand the concern that Wish has and why Wish

16  is here.  I don't mean to discount them.  But given the claims

17  in this case and the facts of this case, the way defendants

18  typically operate in cases like this, the plaintiff's

19  obligation to enforce its trademarks, and the ample

20  opportunity that defendants have to come in and contest these

21  claims and these allegations, they're the ones that should

22  make these arguments before the Court and not Wish.

23          So, as I said, on those bases, the objection is

24  denied.

25          Thank you.

1          MR. KALBAC:  Thank you.

2          MR. RIDGWAY:  Thank you.

3          MR. FITZGERALD:  Thank you, your Honor.

4                    *    *    *    *    *

5

6    I certify that the foregoing is a correct transcript from the
     record of proceedings in the above-entitled matter.
7

8
     /s/ Joseph Rickhoff            December 19, 2019
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25